# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAKE CHARLES DIVISION

| | |
|---|---|
| **MARLIN FONTENOT** | **CIVIL ACTION NO. 05-352-LC** |
| VS. | SECTION "P" |
| **GLOBAL EXPERTISE IN OUTSOURCING, ET AL** | JUDGE MINALDI |
| | MAGISTRATE JUDGE WILSON |

## REPORT AND RECOMMENDATION

Before the court is plaintiff Marlin Fontenot's *pro se* civil rights complaint (42 U.S.C. § 1983) filed *in forma pauperis* on February 24, 2005. Plaintiff, an inmate in the custody of the Louisiana Department of Corrections (LDOC), is confined at the Allen Correctional Center (ACC) in Kinder, Louisiana, and complains of conditions of confinement at that institution. Plaintiff names Global Expertise in Outsourcing (GEO), ACC's Warden O. Kent Andrews, ACC physician Dr. Charles Simon, ACC medical administrator Betty Duplechain, and ACC security officer Lt. Melanie Fowler as his defendants.

## STATEMENT OF THE CASE

Plaintiff, an epileptic, states that on the night of October 11, 2001, or in the early morning hours of October 12, 2001, he suffered a seizure. Security was notified and, in turn, security advised medical personnel. However, before medical assistance arrived, Lt. Fowler (described by plaintiff as "a very large and heavy person") put her knee in plaintiff's lower back area in an attempted to control plaintiff's convulsions. As discussed hereinafter, it was then that plaintiff contends (although he claims that he was not informed of the actual injury until February 2004)

that his back was injured causing his paralysis.[1]  Plaintiff was taken to the infirmary and upon awakening on the morning of October 12, 2001, plaintiff realized that his legs were paralyzed. Plaintiff states that he was advised by Dr. Simon that he had suffered a stroke.  Approximately three or fours days following the "stroke," plaintiff was taken to HPL for "stroke treatment." While there, plaintiff underwent an MRI but was not given the test results.  The personnel at HPL arranged for plaintiff to have a future appointment with a specialist at England Air Force Base (EAFB).  Plaintiff was then returned to the infirmary at ACC.   Plaintiff states that in November of 2001, he was seen by an epileptic specialist at EAFB but was not told the results of the visit. Further, the EAFB physician scheduled a second MRI to be done at HPL, as well as physical therapy treatment.  Plaintiff again returned to the infirmary at ACC.  The second MRI was done at HPL in January or February of 2002, and plaintiff was not informed of the results of his testing.  Plaintiff  returned to EAFB  approximately one year later, at which time he was examined and scheduled for a future appointment with a specialist.  Following the examination, plaintiff returned to ACC's infirmary.  On an unspecified date in 2003, plaintiff saw a specialist at EAFB, and some type of electrode test was performed on plaintiff's legs.  The EAFB physician scheduled an appointment for plaintiff to see a urologist in New Orleans.  Thereafter, plaintiff went back to ACC, where he waited for his urology appointment in New Orleans.  After several months had passed without plaintiff seeing the urologist, he inquired about the delay and was informed that the hospital (Charity) in New Orleans, not ACC, was in charge of scheduling the

---

[1] Plaintiff supports this allegation with affidavits from fellow inmates allegedly awake at the time of the seizure, and who saw Lt. Fowler place her knee in plaintiff's back.  The inmates aver that they heard "loud popping and cracking sounds coming from Marlin Fontenot's bed area." [Doc. 5].  Plaintiff contends that the popping and cracking noises were his spine being injured.

2

appointment. In September or October of 2003, plaintiff states that he was taken to the Lady's and Children's Hospital (LCH) at LSU Medical Center in Bossier City, Louisiana. However, the doctor at LCH did not examine plaintiff because none of plaintiff's diagnostic tests (x-rays, MRI's) were provided to the doctor. Shortly thereafter, plaintiff had additional x-rays and/or MRI's performed at HPL. Following this, in February 2004, plaintiff returned to LCH, where he was informed, for the first time, that his "spinal cord, specifically L-3 and L-4 was crushed." [Doc. 1, p. 9]. Until that time, plaintiff claims that he had been told by ACC medical personnel that he was paralyzed as a result of the stroke. In fact, plaintiff claims that he is still being treated by ACC medical personnel for a stroke. Further, plaintiff states that Dr. Simon has prescribed stroke medication that has not been administered, and despite that the defendants injured plaintiff and are responsible for his injuries, plaintiff has never had any type of corrective surgery. Plaintiff also claims that despite outside doctors ordering physical therapy, such has not been done as Dr. Simon stated that "it would be a waste of time for him to schedule plaintiff for it, because defendant Warden Andrews will not authorize payment for it." [Doc. 1, p. 9].

As a result of the above, plaintiff contends that he was denied proper medical treatment, and that the actions of the defendants constitute deliberate indifference. More specifically, plaintiff claims that GEO, as the defendants' employer, is vicariously liable for the damages which plaintiff sustained as a result of their negligence and deliberate indifference. Further, plaintiff states that defendant Andrews was independently negligent and deliberately indifferent for failing to promulgate rules for treating inmates that suffer seizures, as well as Andrew's failure to approve physical therapy. As to Lt. Fowler, plaintiff contends that she is independently liable as she attempted to act as a medical professional, thereby causing plaintiff's paralysis.

Plaintiff also states that defendant Duplechain is independently liable because as the medical administrator, she failed to authorize an emergency outside hospital trip for plaintiff on the night of his injury. Finally, as to Dr. Simon, plaintiff alleges that he displayed deliberate indifference to plaintiff's serious medical "crisis." In addition to the above, plaintiff contends that the actions of defendants Andrews, Simon, Fowler, and Duplechain constitute a conspiracy, as the defendants deliberately and knowingly hid the true cause of plaintiff's paralysis from him.

Based on the above, plaintiff seeks damages in the amount of $20,000,000.00, as well as attorney's fees and costs of court.

## LAW AND ANALYSIS

### Failure to Exhaust Administrative Remedies

The Civil Rights of Institutionalized Persons Act, 42 U.S.C. §1997e, was amended by the Prison Litigation Reform Act (PLRA). As amended, §1997e(a) makes the exhaustion requirement **mandatory** in prison conditions cases. Section 1997e(a) provides,

> (a) Applicability of Administrative Remedies--No action shall be brought with respect to prison conditions under section 1983 of this title or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Contrary to plaintiff's assertion that his claims are "not an issue for ARP but a tort claim," this case **is** a prison condition case, which is exactly the type of matter that can best be resolved by the prison officials without resort to judicial action. Thus, it is imperative to note that with respect to plaintiff's claims, plaintiff admits that he failed to exhaust administrative remedies before filing this lawsuit as required by 42 U.S.C. §1997e(a). Plaintiff is obviously aware of the administrative remedy procedure at ACC since he acknowledged the existence of

such procedures in his complaint. [Doc. 1, p. 2]. Yet, by his own admission, plaintiff clearly did not even attempt to resolve his grievance by properly utilizing the administrative remedy procedure available through both ACC and the LDOC before filing this suit. [Doc. 1, p. 2].

Under current law, plaintiff must exhaust the administrative remedy procedure before proceeding herein. The statute provides for no exceptions.[2] The statute precludes any further action on these claims until plaintiff has fully exhausted the administrative remedy procedure. See also *Wendell v. Asher*, 162 F.3d 887, 890-91 (5th Cir. 1998)(§1997e(a) "plainly requires that administrative remedies be exhausted before the filing of a §1983 suit, rather than while the action is pending..." "[t]o hold otherwise would encourage premature filing by potential litigants, thus undermining Congress' purpose in passing the PLRA, which was to provide the federal courts some relief from frivolous prisoner litigation."); *Underwood v. Wilson*, 151 F.3d 292, 296 (5th Cir. 1998)(dismissal for failing to exhaust administrative remedies is justified "as a deterrent to premature filing by...other potential litigants, thus serving the Congressional purpose of providing relief from frivolous prisoner litigation..." and "[b]y choosing to file and pursue his suit prior to exhausting administrative remedies as required, [the plaintiff] sought relief to which he was not entitled--that is, federal court intervention in prison affairs prior to the prison having had the opportunity to address the complaint within its grievance procedures.").

Accordingly,

**IT IS RECOMMENDED** that plaintiff's civil rights action be **DISMISSED**

---

[2] see also *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002), "... we hold that the PLRA's exhaustion requirement <u>applies to all inmate suits about prison life</u>, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong. (citation omitted)."

5

**WITHOUT PREJUDICE** for failing to exhaust available administrative remedies prior to the filing of suit as mandated by 42 U.S.C. §1997e.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the clerk of court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. See** *Douglas v. United Services Automobile Association,* **79 F.3d 1415 (5th Cir. 1996).**

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, this 10th day of August, 2005.

ALONZO P. WILSON
UNITED STATES MAGISTRATE JUDGE